UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LIBERTY MUTUAL FIRE INSURANCE
COMPANY,

                              Plaintiff,

         v.                                              No. 22-CV-499 (RA)

                                                         MEMORANDUM
                                                         OPINION & ORDER

ZURICH AMERICAN INSURANCE
COMPANY,

                              Defendant.

RONNIE ABRAMS, United States District Judge:

        In this case, Liberty Mutual Fire Insurance ("Liberty") sues a fellow insurance company,

Zurich American Insurance Company ("Zurich"),[1] seeking a co-insurance contribution relating to

a personal injury lawsuit pending in New York state court (the "underlying action"). Now before

the Court are the parties' cross-motions for summary judgment.

        After the underlying action was filed, Liberty and Zurich's insureds agreed to release each

other—as well as their insurers—from "any and all claims, proceedings, debts, costs, contracts …

actions, suits, liabilities, obligations, expenses, attorney's fees, judgments, damages and/or causes

of action of any nature[.]" The parties nonetheless dispute whether that agreement clearly and

unambiguously released Zurich from any obligation to defend and indemnify claims against

Liberty's insured in the underlying action. Because the Court concludes that it did, Zurich's motion

for summary judgment is granted and Liberty's motion for partial summary judgment is denied.

---

[1] Liberty incorrectly sued Zurich as "Zurich American Insurance Company of Illinois."

## BACKGROUND[2]

This case turns on several agreements between Liberty and Zurich's respective insureds, BlueStream Professional Services, LLC ("BlueStream")[3] and Rightech, Inc. ("Rightech"), as well as the insurance policies they secured relating to a construction project in New York City ("the New York project").

In brief, on June 18, 2019, Jael Downes, a worker at the New York project, filed the underlying action for injuries he allegedly suffered at the construction site, eventually naming BlueStream, a subcontractor on the project, as a defendant. At the time Downes initiated the underlying action, BlueStream was insured by Zurich as an "additional insured" for liability relating to the New York project pursuant to an agreement between BlueStream and Rightech, Zurich's insured. But in October 2019, BlueStream and Rightech executed an agreement that purported to release each other—and their respective insurers—from "any and all claims, … contracts, … [and] liabilities […]." Zurich 56.1 ¶ 32. Nonetheless, Liberty—BlueStream's co-insurer—then brought this action seeking a judgment declaring that Zurich owes a duty to defend and indemnify BlueStream in the underlying action. Zurich argues that the October 2019 agreement released it from any obligation to do so.

The relevant policies and agreements are described in greater detail below.

**The Relevant Policies and Agreements**

On or about December 4, 2017, BlueStream and Rightech entered into a "Technical Staffing Agreement," whereby Rightech agreed to provide technical workers to temporary

---

[2] The Court draws the following facts from the parties' 56.1 Statements of Fact ("56.1") and supporting documents, and are undisputed unless otherwise noted.

[3] The parties' 56.1 statements sometimes refer to BlueStream as "KGP Telecommunications." *See, e.g.,* Liberty 56.1 ¶ 4 (referring to "KGP Telecommuications Inc. d/b/a BleuStream Proessional Services, LLC"). In the interest of clarity, the Court will refer to KGP Telecommunications as BlueStream.

positions for BlueStream for the New York project. Zurich 56.1 ¶¶ 6, 8. The Technical Staffing Agreement also required Rightech to obtain liability insurance related to the New York project, and to include BlueStream as an additional insured on its policy. Specifically, the Technical Staffing Agreement provided as follows:

> I. Prior to commencing Services hereunder, **[Rightech] will procure, maintain and pay for such insurance as will protect against claims for bodily injury or death, or for damage to property, which may arise out of operations by [Rightech]** or by any subcontractor or by anyone employed by any of them, or by anyone for whose acts any of them may be liable. Such insurance will include, but not be limited to, the minimum coverage and limits of liability specified below, or if greater, any coverage or limits of liability required by law.
>
> 2. [Rightech] agrees to maintain the insurance coverage set forth below, at its own expense […] at all times during the term of this Agreement, until completion of all Work associated with this Agreement, or as specified below, whichever is later;
>
> […]
>
> **[Rightech] will endorse its Commercial General Liability policy to add [BlueStream] as an "additional insured" with respect to liability arising out of (a) operations performed for [BlueStream] by [Rightech],** (b) acts or omissions of [BlueStream] in connection with their general supervision of the [Rightech's] operations and (c) **claims for bodily injury or death brought against [BlueStream] by [Rightech's] employees** (including Technical Workers), or the employees of [Rightech's] subcontractors of any tier, however caused, related to the performance of operations under this Agreement. . . .
>
> **[Rightech's] insurance policies listed above will be primary insurance and not excess over, or contributing with, any insurance purchased or maintained by [BlueStream] or its customers and will include completed operations.** […] The Commercial General Liability policy will also include a waiver of subrogation in favor of [BlueStream] and its customers.

*Id.* ¶ 7 (emphasis added).

Following the execution of the Technical Staffing Agreement, on January 12, 2018, Zurich issued Rightech a "Commercial General Liability Policy," for the period from January 18, 2018 to January 18, 2019, pursuant to which Zurich agreed to "pay those sums that the insured [i.e., Rightech] becomes legally obligated to pay as damages because of 'bodily injury' or 'property

damage'" and to assume "the duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply," where "bodily injury," "property damage" and "suit" are defined elsewhere in the policy (the "Zurich Policy"). *Id.* ¶¶ 8, 9; Potashner Decl. Ex. 10. The Zurich Policy also includes a provision for an "Additional Insured," designated as

> **[a]ny person or organization who you are required to add as an additional insured on this policy under a contract or agreement shall be an insured**, but only with respect to that person's or organization's liability arising out of your operations as a 'Staffing Service' or premises owned by or rented to you.

*Id.* ¶¶ 10, 11 (emphasis added). The Zurich Policy further contains an "other Insurance" provision that provides that

> **[t]his insurance is primary insurance to and will not seek contribution from any other insurance available to an additional insured under this policy** provided that: a. The additional insured is a Named Insured under such other insurance; and b. **You [Rightech] are required by a written contract or written agreement that this insurance would be primary and would not seek contribution from any other insurance available to the additional insured**.

*Id.* ¶ 12 (emphasis added).

BlueStream also secured a Commercial General Liability Policy for the period from October 1, 2017 to October 1, 2018 from Liberty (the "Liberty Policy"). *Id.* ¶ 13. Under that policy, BlueStream qualified as a "Named Insured". *Id.* ¶ 14. The Liberty Policy provides that "this insurance is excess over … [a]ny other primary insurance available to you [BlueStream] covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you [BlueStream] have been added as an additional insured." *Id.* ¶¶ 16, 17.

In sum, the Technical Staffing Agreement required Rightech to obtain insurance to cover claims brought against BlueStream by Rightech's employees. *Id.* ¶ 7. It also provided that Rightech's insurance policy would be the primary insurance for any such claims. *Id.* The insurance

policy that Rightech secured from Zurich did just that: it required Zurich to defend against any suit seeking damages for bodily injury at the New York project and added as an "Additional Insured" "any person or organization who you"—i.e., Rightech—"are required to add as an additional insured on this policy under a contract or agreement"—namely, BlueStream, pursuant to the Technical Staffing Agreement. *Id.* ¶¶ 10–12.

**The Class Action Lawsuit Against BlueStream and Rightech**

In 2018, BlueStream and Rightech were named as defendants in a class action in the United States District Court for the Western District of Texas captioned *Tekakenya Mosley, et al v. Rightech, Inc. RTI services, Inc, KGP Telecommunications, Inc. and BlueStream Professional Services, Inc*., No. 5:18-cv-144 (the "Class Action"). *Id.* ¶¶ 22, 23. In that case, Rightech and BlueStream were alleged to have "improperly classified wage payments as 'per diem' payments, and thus failed to pay overtime at the legally required rate" in violation of the "Federal [sic] Labor Standards Act." *Id.* ¶¶ 24, 25; Rose Decl. Ex. 1.

In August 2019, the plaintiffs in the Class Action, along with Rightech and BlueStream, reached a settlement agreement. Zurich 56.1 ¶ 27; Rigney Decl. Ex. E. Liberty asserts, however, that "Rightech refused to perform its payment obligations under the Class Action settlement unless BlueStream agreed to settle a payment dispute brought by Rightech against BlueStream," a claim Zurich denies. Zurich 56.1 ¶ 27. According to a September 6, 2019 letter from an attorney for Rightech, Marc Freedman, BlueStream had failed to pay certain invoices owed to Rightech, "put[ting] Rightech in a precarious position because in the absence of the payment by [BlueStream] Rightech [did] not have the funds to make the settlement payment currently due." Potashner Decl. Ex. 14; Zurich 56.1 ¶ 29.

**The October 2019 Settlement Agreement**

On October 16, 2019, BlueStream and Rightech entered into a letter agreement whereby BlueStream agreed to pay Rightech $100,000 and settle the dispute described in the September 6, 2019 letter (the "October 2019 Agreement"). *Id.* ¶ 30. The October 2019 Agreement, which was negotiated by two attorneys—Amanda Rose for BlueStream and Marc Freedman for Rightech, *Id.* ¶ 33—and signed by BlueStream's "EVP & Chief Services Officer" and Rightech's President, Rose Decl. Ex. 2—contains a preamble that states:

> In follow-up to demand for payment issued by Rightech, Inc. ("RTI") and the ongoing conversations between RTI and BlueStream Professional Services, LLC ("BlueStream") the purpose of this letter agreement ("Agreement") is to fully and finally resolve RTI's claims for payment from BlueStream.

Zurich 56.1 ¶ 31; Rose Decl. Ex. 2. The October 16, 2019 Agreement contains cross-releases, including a release in favor of Rightech, referred to as "RTI," that states:

> By signing below, BlueStream certifies that it […]
>
> (iii) hereby irrevocably and unconditionally releases and forever discharges RTI with respect to payments, both past and present, known and unknown, foreseen and unforeseen, fixed or contingent, suspected or unsuspected at law, by statute, or in equity, which BlueStream has or which could be asserted on its behalf by any person, government authority, or entity, under any oral or written agreement in place with RTI for work performed by RTI for BlueStream prior to and as of October 16, 2019 including, but not limited to, all outstanding claims for credits and payments from RTI; and
>
> (iv) hereby irrevocably and unconditionally releases and forever discharges RTI with respect to any and all claims, proceedings, debts, costs, contracts, liens, accounts demands, actions, suits, liabilities, obligations, expenses, attorney's fees, judgments, damages and/or causes of action of any nature, both past and present, known and unknown, foreseen and unforeseen, fixed or contingent, suspected or unsuspected at law, by statute, or in equity, which BlueStream has or which could be asserted on its behalf by any person, government authority, or entity, resulting from or relating in any way to any oral or written agreement between RTI and BlueStream, RTI's work for BlueStream and RTI's billings to BlueStream through October 16, 2019.

The agreement further states that:

> The parties acknowledge that they may discover facts in addition to or different
> from those that it now knows or believes to be true with respect to the subject matter
> of this Agreement and the release granted herein, but acknowledges that it is their
> intention to fully, finally, and forever settle, release and discharge any and all
> claims against each other known or unknown, foreseen or unforeseen, fixed or
> contingent, suspected or unsuspected which do or do not exist, or heretofore
> existed, and without regard to the subsequent discovery or existence of such
> additional or different facts.

Rose Decl. Ex. 2. In the October 16, 2019 Agreement, "BlueStream" is defined as:

> BlueStream Professional Services, LLC, BlueStream Telecom, LLC and includes
> any of their respective successors, assignees, agents, representatives, businesses,
> affiliates (including KGP Telecommunications, Inc., KGP Telecommunications,
> LLC and KGPCo Inc.), parent companies, subsidiaries, divisions, partnerships,
> limited partnerships, partners, joint ventures, predecessors, officers, directors,
> trustees, conservators, employees, contractors, members, **insurers**, shareholders,
> and attorneys, jointly and severally.

*Id.* (emphasis added). "RTI" is defined as:

> Rightech, Inc., RTI Services, Inc. and includes any of their respective successors,
> assignees, agents, representatives, businesses, affiliates, parent companies,
> subsidiaries, divisions, partnerships, limited partnerships, partners, joint ventures,
> predecessors, officers, directors, trustees, conservators, employees, contractors,
> members, **insurers**, shareholders, and attorneys, jointly and severally.

*Id.* (emphasis added). Liberty asserts that BlueStream entered into the October 19, 2019

Agreement "to ensure Rightech's compliance with the terms of the Class Action Settlement

Agreement" in the Mosley Class Action. Zurich 56.1 ¶ 30. Zurich disputes that characterization,

asserting that BlueStream and Rightech entered the agreement "to resolve outstanding issues

between them that were not resolved as part of the Class Action and to fully and finally terminate

all aspects of their business relationship." *Id.* ¶ 31.

**The Underlying Action**

On June 18, 2019—four months before the October 2019 Agreement was executed—

Downes, and employee of Rightech, filed the underlying action in the Supreme Court of New York

State, Kings County, captioned *Jael Downes v. Harlem Restoration Housing Development Fund Corporation, et al*., Index No. 512500/2019. *Id.* ¶ 1. Downes alleges that on June 21, 2018, he was working as an employee of Rightech at a construction/renovation site located at 1980 Adam Clayton Powell Blvd. New York, New York, *Id.* ¶ 2, and that he sustained injuries after tripping on debris at the project site, Epstein Decl. Ex. 3. Downes amended the complaint in the underlying action on March 2, 2021, joining as defendants "KGP Telecommunications Inc. d/b/a BlueStream Professional Services, LLC and BlueStream Professional Services, LLC." Zurich 56.1 ¶ 4.

**BlueStream and Liberty's Requests for Indemnification in the Underlying Action**

On April 12, 2021, BlueStream tendered the underlying action to Rightech for indemnification pursuant to the Technical Staffing Agreement, demanding "that Rightech agree to indemnify, demand and hold [BlueStream] harmless" in that case. Rigney Decl. Ex. H; Zurich 56.1 ¶ 60. On the same day, Rightech denied BlueStream's request, citing the release in the October 2019 Agreement. *Id.* ¶ 61; Rigney Decl. Ex. I. Zurich asserts, and Liberty denies, that "BlueStream did not respond to or otherwise dispute Rightech's denial of its demand for indemnification for the Underlying Downes Action." Liberty 56.1 Response ¶ 62.

On September 10, 2021, Liberty's counsel tendered the defense and indemnity of BlueStream for the underlying action to Zurich. Zurich 56.1 ¶ 18. On September 23, 2021, Zurich responded by letter, disclaiming coverage and denying that it had any duty to defend and indemnify BlueStream for the underlying action. *Id*. ¶ 19. In its letter, Zurich asserted that pursuant to the "Resolution Agreement between BlueStream and [Rightech], the contract [Liberty] tendered under has been terminated and all obligations thereunder were discharged. Accordingly, since there is no contract or agreement between BlueStream and [Rightech], BlueStream does not qualify as an additional insured on [the Zurich Policy]." Epstein Decl. Ex. 7; Zurich 56.1 ¶ 20.

Liberty initiated this action on January 19, 2022, seeking a declaratory judgment that Zurich is required to defend and indemnify BlueStream for the underlying action, as well as a money judgment for the amount equal to Liberty's costs defending BlueStream. After discovery, Liberty moved for partial summary judgment, after which Zurich cross-moved for summary judgment, asserting that the release in the October 2019 Agreement bars any claims against Zurich relating to the underlying action.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. To survive summary judgment, the moving party has the initial burden of demonstrating that no genuine issue of material fact exists. *See Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). If it satisfies this burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id*.

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). "If there are cross motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgement as a matter of law." *Admiral Indem. Co. v. Travelers Cas. & Sur. Co. of Am.*, 881 F. Supp. 2d 570, 574 (S.D.N.Y. 2012) (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

**DISCUSSION**

Zurich does not dispute that, absent the release in the October 2019 Agreement, it would owe a duty to defend and indemnify BlueStream in the underlying action. Instead, Zurich argues that (1) the October 2019 Agreement bars any claims that BlueStream and Liberty have against Rightech and Zurich; and that (2) the October 2019 Agreement discharged its obligation under the Technical Staffing Agreement to procure additional insured coverage for BlueStream. For the reasons explained below, the Court agrees.

## I.  Choice of Law

As an initial matter, the Court must determine which jurisdiction's law governs this dispute. A federal court sitting in diversity generally applies the choice-of-law rules of the state in which it sits. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 169 (2d Cir. 2015). In New York, courts begin by determining whether there is an actual conflict between the laws of the competing jurisdictions. *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 769 N.Y.S.2d 487, 489 (N.Y. App. Div. 2003), *aff'd,* 789 N.Y.S.2d 461 (2004). The laws of the competing forums are in conflict "where the applicable law from each jurisdiction provides different substantive rules." *Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) (citation omitted). If no conflict exists, "then the court should apply the law of the forum state in which the action is being heard." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006).

The two competing jurisdictions in this case are Minnesota and New York. Zurich suggests—but does not assert—that Minnesota law applies because the Technical Staffing Agreement has a Minnesota choice-of-law provision and Rightech is a Minnesota company. Nevertheless, according to Zurich, "a choice of law analysis is unnecessary here because New York and Minnesota law are in accord that extrinsic evidence cannot be used to explain or alter

the meaning of a contract where the parties have reduced their agreement to an unambiguous writing." Def. Mot at 8. Liberty, for its part, asserts that there is "no actual conflict of law … between and among the laws of New York, New Jersey, and Texas," which it argues are the jurisdictions with the most significant relationships to the transaction and the parties, "regarding the construction and application of a 'general' release." Pl. Reply at 10. According to the law of those states, as well as that of Minnesota, Liberty argues, "courts look beyond the general language in a release in determining whether it applies." *Id.* at 12. The parties thus agree that no actual conflict exists between New York and Minnesota law.

The Court shares that view. As is relevant here, New York and Minnesota law both make clear that where the terms of a contract are unambiguous, extrinsic evidence may not be considered to determine the parties' intent. *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002); *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018). Rather, the law of both states permits the consideration of extrinsic evidence only where a release or other term in a contract is ambiguous. *See, e.g., Julius Blumberg, Inc. v. 52 Habitat Co.*, 606 N.Y.S.2d 234, 235 (N.Y. App. Div. 1994); *Dykes v. Sukup Mfg. Co.*, 781 N.W.2d 578, 582 (Minn. 2010); *see also Born v. Berg*, No. A06-2323, 2007 WL 4472478, at *5 (Minn. Ct. App. Dec. 24, 2007) (declining to consider extrinsic evidence where relevant release was unambiguous). Moreover, because the Technical Staffing Agreement is not the contract in dispute here, its choice-of-law provision does not control. Accordingly, "for practical reasons, that is, for ease of administrating the case," the Court applies New York law. *Wall*, 471 F.3d at 422.[4]

---

[4] Both parties rely on New York law in their briefs, and neither appears to object to the application of New York law. New York therefore applies law for the additional reason that "the parties' briefs assume that New York law controls, and such implied consent is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (citation and modification omitted).

## II.     The Release in the October 2019 Agreement

When the meaning of a contract is in dispute, a court must first determine whether the contract is ambiguous—that is, if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement[.]" *Morgan Stanley Group Inc. v. New Eng. Ins. Co.,* 225 F.3d 270, 275 (2d Cir.2000) (citation omitted). As New York courts make clear, "[a]mbiguity is determined by looking within the four corners of the document, not to outside sources[.]" *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998). If the court determines that the contract is unambiguous on its face, "the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence." *RJE Corp.* v. *Northville Indus. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003). A settlement and release are "construed according to general principles of contract law." *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002); *see Ladenburg Thalmann & Co.* v. *Imaging Diagnostic Sys., Inc.*, 176 F. Supp. 2d 199, 204 (S.D.N.Y. 2001) ("Under New York law, a release is governed by principles of contract law and a court should enforce a valid release by its clear terms.").

Liberty does not argue that the release in the October 2019 Agreement is ambiguous. Nor can it. The release is both clear and broadly defined, "irrevocably and unconditionally release[ing] and forever discharg[ing]" Rightech from

> any and all claims … contracts… actions, suits, liabilities, obligations, expenses … both past and present, known and unknown, foreseen and unforeseen… which BlueStream has or which could be asserted on its behalf by any person, government authority or entity, resulting from or relating in any way to any oral or written agreement between [Rightech] and BlueStream, [Rightech's] work for BlueStream and [Rightech's] billings to BlueStream through October 16, 2019.

Rose Decl. Ex. 2. It expressly defines BlueStream and Rightech to "include[] any of their respective successors, assignees, agents, representatives, businesses, affiliates … [and] insurers[.]" *Id.* Nothing in it indicates it is limited to resolving claims solely related to the Class Action. Rather,

it discharges "all" claims, liabilities, and contracts between the parties and applies to claims "both past and present, known and unknown, foreseen and unforeseen" relating to "any" agreement between Rightech and BlueStream. Its broad provisions thus leave no room for doubt that it discharged Rightech's obligation under the Technical Staffing Agreement to procure coverage for BlueStream, as well as Liberty's claim with respect to the underlying action.

Rather than arguing that the release itself is ambiguous, Liberty asserts that "there is no evidence" that the October 2019 Agreement as a whole "was intended to release [Zurich] or Rightech from the completely unrelated issue of the additional insured obligations owed BlueStream" under the Technical Staffing Agreement. Pl. Mot. at 18. As a result, according to Liberty, it has "no effect on BlueStream's right to insurance coverage under the Zurich Policy" in the underlying action.

Liberty's argument is without merit. While Liberty is correct that "the intent of the parties is paramount in deciding the effect of a release," it is nonetheless also true that "where the terms of a release are unambiguous[,] such intent must be discerned from the four corners of the document rather than from extrinsic evidence." *Ackoff-Ortega v. Windswept Pacific Entm't Co*., 120 F.Supp.2d 273, 282 (S.D.N.Y. 2000); *see Mateo v. Carinha*, 799 F. App'x 51, 54 (2d Cir. 2020) ("[T]he language of the notably broad General Release is clear on its face. In such cases, courts should generally interpret the contract without reference to extrinsic evidence[.]"). Because the Agreement's express terms make abundantly clear that BlueStream and Rightech released "any and all claims … contracts … demands, actions, suits, liabilities, obligations" between them and their insurers, any extrinsic evidence about their subjective intent does not bear on the Court's interpretation of the release. "Without a finding of ambiguity in the first instance, the Court need not consider extrinsic evidence … outside the four corners of the Release, which by its own terms

applies to '*any* claims' Plaintiff may have against Defendant." *Barshay v. Naithani*, No. 20-CV-8579 (KPF), 2023 WL 2051170, at *9 (S.D.N.Y. Feb. 16, 2023).

Liberty also argues that "if the [October 2019 Agreement] was intended to negate the insurance obligation under the [Technical Staffing Agreement or the Zuirch Policy, it would have at least mentioned the [Technical] Staffing Agreement or the Zurich Policy." Reply at 16–17. But Liberty misapprehends the effect of such a general release, which "may encompass unknown claims … if the parties so intend and the agreement is fairly and knowingly made." *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (citation omitted) (holding that general release discharging "all manner of actions" in connection with sale of company ownership interests encompassed "unknown" claims for fraud). The release in the October 2019 Agreement specifically discharges "any and all … claims … contracts … demands, actions, suits, liabilities, [and] obligations … past and present, known and unknown, foreseen and unforeseen" between the parties and their insurers. The Agreement gives no indication that BlueStream and Rightech intended to exclude the Technical Staffing Agreement and the Zurich Policy, which the parties had executed nearly two years earlier.

The Court recognizes that the preamble of the October 2019 Agreement states that the "purpose of this letter agreement … is to fully and finally resolve [Rightech's] claims for payment from BlueStream," although the Agreement does not specify what claims for payment were to be resolved. Rose Decl. Ex. 2. According to Liberty, the preamble's specific mention of Rightech's claims for payment from BlueStream "supports limiting the general words of the release" to Rightech's claims. Pl. Reply at 17.

Liberty's argument, however, again falls short. As courts applying New York law have made clear, the "mere recitation of the specific claims underlying a settlement will not undermine

the broad prophylactic effect of general release language." *Vornado Realty Tr. v. Marubeni Sustainable Energy, Inc.*, 987 F. Supp. 2d 267, 278 (E.D.N.Y. 2013) (concluding that "whereas" statement in general release that stated parties' intent to settle particular action for breach of contract did not limit release's scope). While it is true that the preamble to the October 2019 Agreement mentions Rightech's claims for payment from BlueStream—albeit in vague terms—it "does not contain language cabining the release to that claim," and thus does not narrow the release's reach. *Hui-Wen Chang v. New York City Dep't of Educ.*, 412 F. Supp. 3d 229, 243–44 (E.D.N.Y. 2019) (holding that general release resolving plaintiff's claims for alleged physical injuries also barred an unrelated discrimination claim). In other words, notwithstanding the "recital of [Rightech's] particular claim[s]," the release "does not limit or otherwise restrict itself." *Stevens v. Town of Chenango*, 89 N.Y.S.3d 418, 419–21 (N.Y. App. Div. 2018) (holding that general release containing recital to relevant incident barred separate and unrelated action); *see Northgate Electric v. Barr & Barr,* 877 N.Y.S.2d 36 (N.Y. App. Div. 2009) ("If plaintiff had wished to except its delay claim from the release, it should have included plain language to that effect in the release."). To the contrary, the Agreement's broad release discharges all claims, contracts, demands and liabilities, "known and unknown, foreseen and unforeseen," including those "which BlueStream has or which could be asserted on its behalf by any … entity, resulting from or relating in any way to any oral or written agreement between [Rightech] and BlueStream." Thus, notwithstanding the preamble, the release is expressly not limited claims relating to the Class Action settlement agreement or any particular payment between BlueStream and Rightech.

Furthermore, as courts applying New York law have noted, parties may exchange general releases as consideration for settling narrower claims. For example, in *Rivera v. Wyckoff Heights Med. Ctr.*, a New York appellate court held that a general release in a settlement for claims relating

to a medical center's failure to make payments pursuant to a staff provision agreement also barred a subsequent, unrelated medical malpractice suit, even though the release specifically mentioned the litigation being settled. 978 N.Y.S.2d 337, 341 (N.Y. App. Div. 2014). The court there noted that "the context in which [the release] was executed suggests that the release was a substantial part of the consideration given" by the releasing party in return for the settlement of the staff provision claims, even where "the release predated … the commencement of" the subsequent action. *Id.*

The cases that Liberty relies on do not compel a different conclusion. In *Patos v. Long Is. Living Ctr.*, the defendant in an action for unpaid wages sought to assert a release from a settlement in a separate personal injury action that expressly stated it was a "RELEASE FOR PERSONAL INJURY CLAIM." 171 N.Y.S.3d 908 (N.Y. App. Div. 2022). In *Mandall v. City of New York*, the relevant release was limited to "all claims which were or could have been alleged by [plaintiff] in the [action] arising out of the events alleged in the Complaint and in the Amended Complaints in said action."  No. 02-CV-1234 (WHP) (FM), 2008 WL 754666, at *3 (S.D.N.Y. Mar. 17, 2008). No such limiting language is present here. And in *Actrade Fin. Techs., Ltd.*, a bankruptcy court found that a release did not cover the relevant claims where it was "replete" with references to two specific types of bonds, not those at issue in the case, and did not mention bonds generally, or use the language "global" or "general." 424 B.R. 59, 71–72 (Bankruptcy S.D.N.Y. 2009). Here, by contrast, the release in the October 2019 Agreement is "not reasonably susceptible of more than one interpretation." *Long v. O'Neill*, 5 N.Y.S.3d 42, 45 (N.Y. App. Div. 2015) (citation omitted).

In sum, "a valid release constitutes a complete bar to an action on a claim which is the subject of the release," *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011) (citation omitted). The October 2019 Agreement clearly and unambiguously released

Zurich from any obligation it had to defend and indemnify BlueStream—including in the underlying action. The "fact that [Liberty] may have intended something else is irrelevant," and "a mere unilateral mistake ... with respect to the meaning and effect of the release ... does not constitute an adequate basis for invalidating" it. *Booth v. 3669 Delaware, Inc.*, 662 N.Y.S.2d 642 (N.Y. App. Div. 1997), *aff'd*, 92 N.Y.2d 934 (1998).

## CONCLUSION

For the foregoing reasons, Zurich has neither a duty to defend nor indemnify BlueStream in the underlying action. Zurich's motion for summary judgment is therefore granted, and Liberty's motion for partial summary judgment denied. The Clerk of Court is respectfully directed to terminate Dkts. 26 and 32, to enter judgment consistent with this Memorandum Opinion and Order, and to close the case.

SO ORDERED.

Dated:       August 3, 2023
             New York, New York

_____
Ronnie Abrams
United States District Judge